**NOT FOR PUBLICATION**

<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF NEW JERSEY</u>

_____
                                                        :
PETER LEITCH                                   :
                                                        :
                Plaintiff,                          :
                                                        :          Civil Action No. 07-3863 (JAG)
                        v.                           :
                                                        :                    **OPINION**
COMMISSIONER OF SOCIAL           :
SECURITY ADMINISTRATION,        :
                                                        :
                Defendant.                        :
_____:

**<u>GREENAWAY, JR., U.S.D.J.</u>**

**<u>INTRODUCTION</u>**

Plaintiff Peter Leitch ("Plaintiff") seeks review of the Commissioner of Social Security's (the "Commissioner") decision to deny his application for Disability Insurance Benefits ("DIB"), pursuant to 42 U.S.C. §405(g) and 5 U.S.C. §706. Plaintiff asserts two reasons why this Court should remand the case for further consideration. Plaintiff complains that the Commissioner failed to develop the record on which he based his decision fully, and that the Commissioner's assessment regarding Plaintiff's Residual Functional Capacity[1] is not supported by "substantial evidence." For the reasons set forth in this opinion, this Court shall affirm the decision of the Commissioner.

_____

[1] Residual functional capacity ('RFC') is defined as that which an individual is still able to do despite the limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a).

## I. <u>PROCEDURAL HISTORY</u>

On March 11, 2002, Plaintiff submitted an application for a period of disability and DIB under Title II of the Social Security Act ("SSA").  (Tr. 69-71.)  This application was denied initially, on July 1, 2002, and upon reconsideration on December 26, 2003.  (Tr. 35-37, 44-46.)  Plaintiff then filed for a hearing by an administrative law judge ("ALJ") on February 3, 2003.[2]  (Tr. 47.)  The hearing was held on February 18, 2004, and Plaintiff testified.  (Tr. 319.)

On March 24, 2004, ALJ Katherine B. Edgell issued a decision granting Plaintiff's claim for a period of disability, but denying Plaintiff's claim for DIB and SSI.  (Tr. 315-17, 319-25.)  ALJ Edgell found that Plaintiff had a significantly eroded RFC, due to spinal impairment, from September 27, 1999 through March 8, 2002.  (Tr. 320.)  As a result, ALJ Edgell granted Plaintiff a period of disability.  (Tr. 324-25.)  ALJ Edgell denied Plaintiff's claim for SSI and DIB because she found that Plaintiff's capacity for light work was not significantly eroded by his additional non-exertional limitations since March 8, 2002.  (Tr. 323.)

On May 13, 2004, Plaintiff filed for a review of ALJ Edgell's decision by the Appeals Council.  (Tr. 332.)  The Appeals Council, in an order issued on December 9, 2005, remanded the case for further proceedings.  (Tr. 332, 329-31.)  Pursuant to the Appeals Council's order, ALJ John M. Farley held a hearing on April 11, 2006 (Plaintiff appeared and testified).[3]  (Tr.

---

[2] Plaintiff also filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act on February 3, 2003, which was immediately escalated to the hearing level for consideration along with Plaintiff's antecedent Social Security Administration ("SSA") claims.  (Tr. 311-13.)

[3] The remand order from the Appeals Council did not specify whether the same ALJ was to preside over the subsequent hearing.  (Tr. 329-31.)  Nothing else in the record indicates why ALJ Farley presided over the April 11, 2006 hearing instead of ALJ Edgell.  (Tr. 390-403.)

390-403.)  ALJ Farley left the record open for two weeks from the date of the hearing to allow Plaintiff's attorney time to obtain and to submit additional evidence of Plaintiff's disability.  (Tr. 402.)  According to ALJ Farley's decision issued on September 20, 2006, "nothing was received and the record was closed."  (Tr. 18.)  ALJ Farley found that the record was adequate to determine whether Plaintiff was disabled, and that no further evidence was required.  (Id.)  ALJ Farley concluded that Plaintiff was not disabled, therefore denying Plaintiff's claims for a period of disability, DIB, and SSI.  (Tr. 32.)

   To support his ruling, ALF Farley found that:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2007.

2. The claimant has not engaged in substantial gainful activity since September 27, 1999, the alleged onset date (20 C.F.R §§404. 1520(b), 404.1571 et seq., 416.920(b) and 416.971, et seq.).

3. The claimant has the following severe impairments: a history of chronic back pain status post L4-L5 diskectomy and laminectomy (20 C.F.R §§404. 1520(c), and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1 (20 C.F.R §§404.1520 (d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. The claimant has the residual functional capacity to perform a range of light and sedentary work activity consisting of lifting and carrying 10 pounds frequently; 20 pounds occasionally; sitting for 6 hours in an 8-hour workday; and standing and walking for up to 4 hours in an 8-hour workday.  He has occasional restrictions in such postural activities as climbing, crouching, and stooping.

6. The claimant is unable to perform any past relevant work (20 C.F.R §§404.1565, 416.965).

7. The claimant was born on February 6, 1957 and was 42 years old on the

3

alleged disability onset date; and he is now 48 years of age, which is defined as a younger individual ages 18-44 and 45-49 (20 C.F.R §§404.1563, 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 C.F.R §§404.1564, 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R §§404.1560 (c), 404.1566, 416.960 (c), and 416.966).

11.   The claimant has not been under a "disability", as defined in the Social Security Act, from September 27, 1999 through the date of the decision (20 C.F.R §§404.1520(g) and 416.920(g)).

(Tr. 20-31.)

The Appeals Council received Plaintiff's request for a review on November 2, 2006, and issued an unfavorable decision as to Plaintiff's request on June 14, 2007. (Tr. 7-13.) Unlike ALJ Farley, however, the Appeals Council received additional evidence, which it incorporated into the record and considered before rendering its decision. (Tr. 10.) The ALJ's decision became the final decision of the Commissioner. (Tr. 7.)

Plaintiff filed a complaint in this Court on August 14, 2008. (Docket Entry # 1.) Plaintiff alleges, first, that the ALJ failed to use every reasonable effort to develop the record fully upon which he based his September 20, 2006 decision; and second, that the ALJ's misrepresentation and selective review of the medical evidence of record and hearing testimony led to an RFC assessment that is not supported by substantial evidence. (Pl. Br. at 19.)

## II.  STATEMENT OF THE FACTS

### A.  Background

Plaintiff, a 51-year old man, was born on February 6, 1957.  (Tr. 188.)  He speaks English and is literate.  (Tr. 69.)  Plaintiff has a high school education, attended vocational school for training as an electrician for two years, and has one year of college education.  (Tr. 102, 394.)  Plaintiff worked as an electrician for over twenty years.  (Tr. 102.)  He described his job as involving loading materials and equipment, setting up ladders and scaffolds, bending and installing conduits, installing devices, and writing reports.  (Tr. 101.)

### B.  Claimed Disabilities

Plaintiff alleges that he has been disabled since September 27, 1999, due to a back injury resulting from a work-related accident in which Plaintiff fell from a bucket on which he was standing.  (Tr. 69, 183-84.)  Plaintiff eventually had back surgery on May 15, 2001, but alleges his symptoms have actually gotten worse since the surgery.  (Tr. 225-27, 367.)  Plaintiff expresses feeling a constant burning pain in his back, and a need to lie down approximately eighteen hours a day.  (Tr. 401.)  Plaintiff, however, alleges that his sleep is compromised because he cannot find a comfortable position.  (Tr. 275, 367.)  Plaintiff states that bending and getting up is difficult, that the pain is exacerbated with standing, and is most severe when he engages in prolonged sitting.  (Tr. 378.)  Plaintiff claims he is unable to sit for more than half an hour at a time or stand for more than one hour.  (Id.)  He asserts that walking for about two and a half hours each day, for eight to ten miles, relieves his pain.  (Id.)

### C.  Medical Evidence Considered by the ALJ

The record indicates that Plaintiff has been evaluated by physicians on several occasions.

5

1.      Clifton Immedicenter

Plaintiff was examined at Clifton Immedicenter on September 29, 1999 for his lower

back pain.  (Tr. 183.)  Plaintiff was diagnosed with a contusion and sprain of the thoracolumbar

spine.[4]  (Tr. 181.)  His treatment plan required an x-ray of the thoracolumbar region and ice

treatment, and Dr. Maryann Alessio prescribed Celebrex and Flexeril.  (Id.)  According to Dr.

Mary T. O'Connor, the lateral film from the x-rays demonstrated a mild straightening of the

normal lumbar curvature.  (Tr. 180.)  Plaintiff was placed on light duty, and was not allowed to

perform heavy lifting, squatting, bending, or pushing and pulling.  (Tr. 181.)   Dr. Alessio found

that Plaintiff's authorized activity level included sitting, walking, grasping, and reaching above

his shoulder.  (Id.)  At an earlier visit to Immedicenter on August 3, 1999, where Plaintiff's chief

complaint was lower back pain, Dr. Francesco Lima, a general family practitioner, found that

Plaintiff had a good range of motion ("ROM").  (Tr. 184.)  Plaintiff was diagnosed with lower

back strain, and was asked to alternate his treatment between heating and icing.  (Id.)

Under the care of Dr. Alessio, Plaintiff's treatment plan, physical capability, and

medication remained constant through October 11, 1999, at which point Plaintiff reported mild

improvement; Plaintiff was sleeping better, although he still felt some pain in the region and had

difficulty moving.  (Tr. 175-76, 178.)

2.      Dr. Bryan J. Massoud

Plaintiff was under the care of Dr. Massoud of Orthopaedic Associates, between

November 11, 1999 and March 15, 2001.  (Tr. 195-216.)  On November 11, 1999, Plaintiff

---

[4] Thoracolumbar refers to "the thoracic and lumbar parts of the spinal column."
http://dictionary.reference.com/browse/thoracolumbar.

6

visited Dr. Massoud performed a physical examination and observed that Plaintiff had a nonantalgic[5] gait, limited ROM on the lumbar spine due to pain, a positive straight leg raise on the left, and negative straight leg raise on the right.  (Tr. 214.)  While Plaintiff's manual motor testing in his lower extremities was intact, the x-ray showed degenerative changes at the L4-L-5 levels, with disk space narrowing.  (Id.)

Dr. Massoud's initial impression was that Plaintiff had lumbar strain syndrome.  (Id.)  He directed Plaintiff to obtain an MRI[6] of the lumbar spine, and recommended that Plaintiff begin physical therapy.  (Id.)  Dr. Massoud renewed Plaintiff's Celebrex and Flexeril medications, and gave Plaintiff a lumbar corset which was intended to relieve Plaintiff's pain.  (Id.)

As of January 6, 2000, Dr. Massoud noted that Plaintiff complained of central back pain, and difficulty with prolonged standing, bending, and lifting.  (Tr. 210.)  Plaintiff stated to Dr. Massoud that rest partially relieves the pain.  (Id.)  A physical examination revealed that Plaintiff walked with a nonantalgic gait and had paraspinal muscle spasms.  (Id.)  While Plaintiff's manual motor testing remained intact, the results of an MRI test indicated "degenerative disc [sic] disease."  (Id.)  Interestingly, Plaintiff's physical therapy was not initially approved by the insurance company.  (Id.)  By February 7, 2000, Plaintiff's physical therapy had been approved, and he had been to three sessions of physical therapy.  (Tr. 207-08.)  Nevertheless, Plaintiff continued to complain of back pain.  (Tr. 207.)

---

[5] Antalgic is a posture assumed in order to lessen pain.  www.thefreedictionary.com, http://medical-dictionary.thefreedictionary.com/antalgic.

[6] MRI refers to Magnetic Resonance Imaging. It is "a noninvasive diagnostic procedure employing an MRI scanner to obtain detailed sectional image of the internal structure of the body."  http://dictionary.reference.com/browse/MRI.

Diskography[7] revealed that Plaintiff had severe discogenic pain at the L4-5 levels of his spine.  (Id.)  Dr. Massoud concluded that Plaintiff failed "conservative care," and was in need of a surgical operation, particularly an anterior lumbar interbody fusion.[8]  (Id.)  On May 15, 2000, Dr. Massoud noted for the first time, that Plaintiff walked with an antalgic gait, while his complaints of pain associated with physical movements, and results of physical examination remained consistent.  (Tr. 206.)  Plaintiff's condition had not improved by March 15, 2001, when Dr. Massoud reported that Plaintiff was scheduled to see Dr. Hess for a second opinion before proceeding to surgery.  (Tr. 196.)

3.      Dr. Richard E. Pelosi

Plaintiff was examined by Dr. Pelosi, a neurosurgeon, on March 1, 2001.  (Tr. 193.)  Dr. Pelosi noted Plaintiff's medical history, which indicated a painful disk herniation at the L4-5

---

[7] Diskography is the radiographic examination of individual intervertebral disks after introduction of a radiopaque contrast medium into the center of the disk.  It is used in the investigation of ruptured disks but has largely been replaced by MRI and CY myelography. MOSBY'S MEDICAL, NURSING & ALLIED HEALTH DICTIONARY, 533 (6th ed. 2002) (hereinafter "Mosby's").

[8] Spinal fusion is the fixation of an unstable segment of the spine.  It is accomplished by skeletal traction or immobilization of the patient in a body cast but most frequently by a surgical procedure.  Operative ankylosis may be performed in the treatment of spinal fractures or after diskectomy or laminectomy for the correction of a herniated vertebral disk.  Surgical fusion involves the stabilization of a spinal section with a bone graft or synthetic device introduced through a posterior incision in the lumbar region; in the less frequently fused cervical region the incision may be anterior or posterior.  Mosby's at 1614.  The record indicates that Plaintiff's surgery required bone grafting, as well as implanting a titanium BAK cage.  (Tr. 194, 220-21, 225-27.)

A laminectomy is a surgical removal of the bony arches of one or more vertebrae.  It is performed to relieve compression of the spinal cord as caused by a bone displaced in an injury, as the result of degeneration of a disk, or to reach and remove a displaced intervertebral disk. Mosby's at 972.

level and complaints of lower back pain associated with bodily movement.  (Id.)  Dr. Pelosi

observed that plaintiff has a normal gait, with normal heel and toe walking.  (Id.)  There was a

decreased ROM of the lumbar spine of a moderate to severe degree both with flexion and

extension.  (Id.)  However, Dr. Pelosi detected no focal motor weakness.  (Id.)  Dr. Pelosi

recommended a "TLSO"[9] back brace, to be worn for four weeks.  (Id.)  Dr. Pelosi noted that

Plaintiff would be examined for substantial improvement with the "external orthosis" before

being considered for an anterior[10] lumbar[11] interbody discectomy[12] and fusion with BAK titanium

cages and bone graft.  (Tr. 194.)  Dr. Pelosi noted that Dr. Hess is an expert in this area of

medicine and that Dr. Hess will completely take over the case.  (Id.)

4.    Dr. Harold A. Hess

On April 2, 2001, Dr. Hess, a neurosurgeon specializing in surgical procedures involving

the spine, examined Plaintiff.  (Tr. 270.)  Upon physical examination he discovered that Plaintiff

had 5/5 muscle strength, and normal muscle groups in both lower extremities, with normal tone

---

[9] TLSO is an abbreviation for thoracolumbosacral orthosis which is a spinal orthosis that
goes over the lumbar, sacral, and thoracic regions and thus limits movement of the thorax;
different types vary in rigidity and in the kind of support given to the thorax.  Mosby's at 1705.

Dr. Pelosi recommended a TLSO body jacket which is an orthopedic cast that encases the trunk
of the body but does not extend over the cervical area; it may be equipped with shoulder straps.
The cast is used to help position and immobilize the trunk for the healing of spinal injuries and
scoliosis and after spinal surgery.  Mosby's at 223.

[10] Anterior refers to the front of the spine or pertaining to a surface or part situated toward
the front or facing forward.  Mosby's at 105.

[11] Lumbar pertains to the part of the body between the thorax and the pelvis.  Mosby's at
1025.

[12] Diskectomy is an excision of an intervertebral disk.  Mosby's at 533.

9

and bulk.  (Id.)  Plaintiff's sensory examination was "intact to pinprick and light touch."  (Id.)

Plaintiff's reflexes were symmetrical and non pathological, his Babinski[13] was negative, and he

had a negative straight leg raising bilaterally.  (Id.)  On reviewing Plaintiff's MRI scan, Dr. Pelosi

determined that Plaintiff had degenerative disk disease at L4-L5, and discogenic pain at the L4-5

spinal level.  (Id.)  Dr. Hess recommended "an L4-L5 anterior diskectomy, BAK cages

implantation and interbody fusion, utilizing bank bone as well as bone grafting."  (Id.)  On May

15, 2001, Dr. Hess, along with Dr. Anusak Yiengpruksawan, performed surgery on Plaintiff at

Valley Hospital.  (Tr. 220-21, 225-27.)

On July 16, 2001, approximately two months after the surgery, Plaintiff returned to Dr.

Hess for a follow-up examination.  (Tr. 269.)  Although Plaintiff expressed that the overall

condition of his pain had improved, he reported a few incidents of increased pain in his back.

(Id.)  After performing a neurological examination, Dr. Hess observed that the x-rays show good

position of the instrumentation,[14] and concluded that Plaintiff was doing well.  (Id.)  Dr. Hess

recommended that Plaintiff visit a physiatrist[15] to begin a course of physical therapy and back

rehabilitation.  (Id.)

---

[13] The Babinski reflex is the "dorsiflexion of the big toe with extension and fanning of the other toes elicited by firmly stroking the lateral aspect of the sole of the foot.  The reflex is normal in newborns and abnormal in children and adults, in whom it may indicate a lesion in the pyramidal tract."  Mosby's at 171.

[14] Instrumentation here refers to the BAK titanium cages that were placed in Plaintiff's anterior lumbar spinal section during the surgery.  (Tr. 207, 220-221, 225-227, 270.)

[15] A physician specializing in physical medicine and rehabilitation who had been certified by the American Board of Physical Medicine and Rehabilitation after completing residency and other requirements.  Mosby's at 1339.

Three months after the operation, on August 27, 2001, Dr. Hess again noted that Plaintiff was doing well.  (Tr. 268.)  Plaintiff's neurological examination remained unchanged, his x-rays continued to show good position of the instrumentation, and Plaintiff was scheduled to start physical therapy in one week.  (Tr. 268.)

Plaintiff did not begin physical therapy in one week, but instead began one week prior to his fifth-month follow-up examination on October 22, 2001, because his insurance did not immediately approve his physical therapy.  (Tr. 267.)  According to Dr. Hess, Plaintiff reported increased lower back pain since starting physical therapy.  (Id.)  Despite this, however, Plaintiff's neurological examination remained unchanged, and his x-rays continued to show good position of the instrumentation.  (Id.)  Dr. Hess instructed Plaintiff to continue a comprehensive back rehabilitation program under the direction of the physiatrist.  (Id.)

Six months after Plaintiff's surgery, during a follow-up on December 3, 2001, Plaintiff informed Dr. Hess that he recently completed a course of physical therapy.  (Tr. 265.)  While he reported that his back pain had been under control, Plaintiff complained that he has pain primarily when he sits for a long period of time or after standing up.  (Id.)  Dr. Hess observed that his instrumentation remains in good position, and recommended that Plaintiff begin a "work hardening program."

About ten months after his surgery, on March 1, 2002, Plaintiff informed Dr. Hess that his physical therapy should be ending soon.  (Tr. 263.)  Plaintiff reported that he has had decreased mobility of his lower back, and difficulty taking a bath in the tub.  (Id.)  Overall, Plaintiff attests that he has "good days and bad days" when dealing with the lower back pain. (Id.)  Upon examination, Dr. Hess observed that the results remain unchanged and that x-rays

11

show good position of the instrumentation.  (Id.)  On March 24, 2002, eleven months after the

surgery, Dr. Hess recorded the status of Plaintiff's lower back pain as "intermittent," and opined

that Plaintiff had reached maximum medical improvement.  (Tr. 261.)

On August 30, 2002, approximately sixteen months after Plaintiff's surgery, Plaintiff

complained of continuing lower back pain, explaining that the pain forces him to lie down for the

majority of the day.  (Tr. 260.)  Dr. Hess observed that Plaintiff's examination remained

unchanged, but ordered an MRI scan.  (Id.)  Dr. Hess noted that if the MRI does not show a

surgically correctable lesion, he would recommend chronic pain management.  (Id.)

On October 9, 2002, about seventeen months after surgery, Plaintiff returned to Dr. Hess'

office, complaining of low back pain, and occasional numbness through both legs, as well as an

occasional "gouty" type pain in his upper left leg.  (Tr. 360.)  Upon reviewing the MRI scan, Dr.

Hess observed that it failed to show a disc herniation or stenosis, and that he had no explanation

for Plaintiff's symptoms.  (Id.)  Dr. Hess suggested additional surgery to stop the lower back

pain, but Plaintiff refused, and Dr. Hess recommended Plaintiff seek chronic pain management.

(Id.)

5.      Dr. Thomas Ragukonis

Dr. Ragukonis, a diplomate of the American Board of Anesthesiology and Academy of

Pain Management, performed his initial evaluation of Plaintiff on April 8, 2002.  (Tr. 247.)  He

observed that Plaintiff's cranial nerves are intact.  (Id.)  Plaintiff has no difficulty with heel or toe

walking, but has dramatically decreased flexion and extension when pain is provoked.  (Id.)  Dr.

Ragukonis' impression was that Plaintiff has failed back syndrome, status post anterior cage

diskectomy at L4-L5, intermittent lower extremity radiculopathies[16] and low back pain.  (Tr. 248.)  Dr. Ragukonis instructed Plaintiff to participate in physical therapy, and advised that he obtain an EMG[17] and a postoperative MRI.  (Id.)  In addition, Dr. Ragukonis planned to prescribe Celebrex and to administer an empiric lumbar epidural steroid injection.  (Id.)

     6.     <u>Dr. Alan Friedman</u>

Dr. Friedman, a consulting physician for the State of New Jersey Department of Labor, Division of Disability Determination Services, reiterated Plaintiff's medical history and complaints of pain.  (Tr. 275.)  On November 12, 2002, Dr. Friedman recorded Plaintiff's statement that he had not had much pain relief since the time of surgery.  (Id.)  Plaintiff reported a "constant burning pain" in his back, and that he needed to lie down approximately fifteen hours a day.  (Id.)  Plaintiff also stated that whenever possible, he walks a number of miles per day, for two hours.  (Id.)  After walking, however, Plaintiff stated he has vague fatigue in his legs, which makes him unable to place his foot properly.  (Id.)  In addition, Plaintiff needs to lie down for the rest of the day after walking for awhile.  (Id.)  Plaintiff also complained of his inability to sleep because he cannot find a comfortable position, and has numbness in both legs shortly after walking.  (Id.)  Plaintiff was taking Tylenol, Ibuprofen, and Hydrocodone for the pain.  (Id.)

During physical examination, Dr. Friedman observed that Plaintiff was in no acute distress, and can independently ascend and descend the exam table, as well as "don and doff" his shoes and socks.  (Tr. 276.)  Plaintiff's gait is heel to toe without deviation; he can walk on his

---

[16] Radiculopathy is a disease involving a spinal nerve root.  <u>Mosby's</u> at 1459.

[17] EMG is an abbreviation for "electromyography."  <u>Mosby's</u> at 590.  Electromyography is the electrical recording of muscle action potentials.  <u>Mosby's</u> at 582.

toes, heels, and squat, and can bilaterally stand on one leg.  (Id.)  Plaintiff's reflexes are

symmetric bilaterally in the upper and lower extremities with no pathologic reflexes, and despite

pain from resistance in his lower extremities, Plaintiff has 5/5 strength bilaterally in upper and

lower extremities.  (Id.)  However, Plaintiff is unable to provide resistance for more than a few

seconds in lower extremities.  (Id.)  Plaintiff's pinprick sensation is diminished over the left L5

dermatome[18], and straight leg raising is negative.  (Id.)  Plaintiff has a full range of motion

bilaterally in upper and lower extremities; including shoulders, elbows, wrists, knees, hips,

ankles, and cervical and lumbar spine.  (Id.)  Dr. Friedman's impression was that Plaintiff

possibly had left L5 radiculopathy, chronic in nature, as well as chronic pain as part of the post

laminectomy syndrome.  (Id.)

      7.     <u>Kessler Institute for Rehabilitation</u>

      Plaintiff began rehabilitation at Kessler Institute for Rehabilitation on December 12,

2001.  (Tr. 280.)  The therapist's report, drafted by Kristen Kendell dated January 25, 2005,

recommended that Plaintiff continue the program for four more weeks in order to increase his

standing or walking time from four hours to between six and eight hours per day, more reflective

of Plaintiff's workday.  (Tr. 280.)  As of March 8, 2002, Plaintiff was able to carry twenty

pounds, lift eighteen pounds, push forty pounds, and carry ten pounds up and down a ladder.  (Tr.

281.)  Finally, the therapist's report states that Plaintiff demonstrates good body mechanics and

had decreased complaints of pain.  (Id.)

---

     [18] Dermatome is an area on the surface of a body innervated by different fibers from one
spinal root.  <u>Mosby's</u> at 504.

8.      Dr. Todd Koppel[19]

Plaintiff first visited Dr. Koppel, who specializes in anesthesiology and pain

management, on August 2, 2005.  (Tr. 367.)  Dr. Koppel recorded Plaintiff's medical history and

repeated complaints of pain.  (Id.)  According to Dr. Koppel, Plaintiff's symptoms have been

worse since his back surgery; Plaintiff never experienced extreme symptoms until after the

surgery, and his condition has not improved.  (Id.)  Plaintiff expressed multiple complaints of

aching, throbbing, and shooting pain.  (Id.)  The pain, according to Plaintiff, was constant, and

got progressively worse throughout the day.  (Id.)  Plaintiff could only perform for four hours per

day without intolerable pain.  (Id.)  Due to the pain, Plaintiff was forced to lie down, rest, and

take medication to alleviate the symptoms.  (Id.)  While Plaintiff's treatment included physical

therapy and surgery, he also contemplated epidural injections.  (Id.)

Dr. Koppel physically examined Plaintiff, and found that, in his lower extremities,

Plaintiff had greater extension in his right knee than the left, flexion was positive, and no motor

or sensory deficits were apparent.  (Id.)  The left Achilles reflex was slightly diminished at 1 to

1.5/4, but otherwise his reflexes were 2/4 and equal.  (Id.)  The lumbosacral spine revealed

straightening of the normal lordosis[20] with straight leg raising at fifty degrees bilaterally.  (Id.)

Finally, Dr. Koppel observed exquisite and severe, diffuse tenderness over the dorsal spine,

_____

[19] While the entire record includes documents regarding Dr. Koppel's care for Plaintiff
until April 5, 2006, the ALJ stated in his decision of September 20, 2006 that the medical records
Plaintiff's attorney submitted from Dr. Koppel only evidenced treatment that Dr. Koppel
provided from August 2, 2005 through August 23, 2005.  (Tr. 378-79.)

[20] Lordosis means "bent forward."  It is an abnormal anterior concavity of the lumbar part
of the back.  Mosby's at 1021.

15

paraspinous musculature, and sacroiliac joint.[21]  (Id.)  Dr. Koppel concluded that spinal etiology and radiculopathy appeared likely, and suggested that Plaintiff try an epidural steroid injection to attempt to determine the degree to which epidural pathology may exist.  (Id.)  After discussing the risks, benefits, and expectations of an epidural steroid injection, Plaintiff returned to Dr. Koppel on August 9, 2005 to receive this injection and was subsequently discharged.  (Tr. 366.)

Plaintiff again met with Dr. Koppel on August 23, 2005, reporting temporary relief from the lumbar epidural injection that was fifty percent at best.  (Tr. 365.)  The pain had since increased.  (Id.)  Dr. Koppel physically examined Plaintiff and found that his palpation over the dorsal spine was minimally tender, with the greatest tenderness over Plaintiff's paravertebral aspect.  (Id.)  Dr. Koppel diagnosed Plaintiff with possible lumbar facet joint arthropathy,[22] post-laminectomy pain syndrome, and lumbar nerve root disorder.  (Id.)  Dr. Koppel recorded that "Plaintiff's condition may not be diskogenic[23] in nature", because Plaintiff was reporting no change in his ongoing symptoms from the surgery or other treatment.  (Id.)

8.      Dr. Michael Rutigliano

In an undated letter addressed "to whom it may concern," Dr. Rutigliano, a general family practitioner, reported that Plaintiff had been under his care since May 8, 2001, and that Plaintiff

---

[21] Sacroiliac joint is defined an irregular synovial joint between the sacrum and the ilium on either side.  Mosby's at 1528.

[22] Arthropathy is defined as any disease or abnormal condition affecting a joint.  Mosby's at 136.

[23] Diskogenic is defined as being caused by "a derangement of an intervertebral disk." www.thefreedictionary.com, http://medical-dictionary.thefreedictionary.com/diskogenic.

has chronic back pain that had disabled him.  (Tr. 386.)  The letter goes on to provide a brief

medical history, and explains that Plaintiff continues to suffer post-operative pain, which

physical therapy and pain management have failed to eliminate.  (Id.)  The pain, which has

greatly affected Plaintiff's quality of life and ability to work, requires Plaintiff to use daily

narcotic pain medication.  (Id.)  Plaintiff's continued need for narcotics impairs his ability to

drive, concentrate, and calculate.  (Id.)  Dr. Rutigliano recommended that Plaintiff be considered

permanently disabled and receive social security benefits.  (Id.)

**D.**     **Additional Medical Evidence Considered By Appeals Council**

        1.      Dr. Todd Koppel

        Although the ALJ only considered records of treatment Dr. Koppel provided to Plaintiff

from August 2, 2005, through August 23, 2005, there is additional medical evidence of Dr.

Koppel's medical services, dated April 5, 2006.  (Tr. 378-79.)  Dr. Koppel recorded that April 5,

2006 was the first time Plaintiff visited his office since August of 2005.  (Id.)

        Plaintiff reported the usual symptoms, which include aching and throbbing back pain with

a radicular[24] component in the lower extremities.  (Tr. 378.)  Plaintiff's complaints of pain were

not of a sharp pain, but more of a pressure pain, which is exacerbated when sitting as well or

standing.  (Id.)  Plaintiff cannot sit for more than a half hour at a time, or stand for more than one

hour.  (Id.)  Dr. Koppel found it surprising that Plaintiff reported walking eight to ten miles at a

time for about two and a half hours.  (Id.)  Plaintiff said his pain is minimal when walking or

---

        [24] Radicular is defined as "pertaining to a root, such as spinal nerve root or radical."
Mosby's at 1458.

17

bicycling, and bending and getting up are difficult.  (Tr. 378-79.)  While Dr. Koppel was

surprised to find that Plaintiff is capable of bicycling and walking a few hours per day, Plaintiff

stated that these activities place less stress on the spine, and Dr. Koppel opined in the report that

this may be because these activities keep the spine in a neutral position.  (Tr. 379.)  Plaintiff is

also able to go shopping, but can only carry packages that are twenty pounds or less, and must

carry them close to his body, because anything more would put him out for the rest of the

day.  (Tr. 378.)  Plaintiff's overall level of functioning remains poor; he spends fifty to sixty

percent of the day in a sedentary state, and is unable to perform social activities.  (Id.)

Dr. Koppel's impression is that Plaintiff continues to experience severe low back pain,

and that his symptoms were not improved by the surgery, or may have worsened.  (Id.)

Plaintiff's condition, according to Dr. Koppel, is very complex, and could involve permanent

root damage.  (Id.)  Plaintiff's difficulty in sitting and extending his back from a bending position

suggests spinal etiology, which may involve articular joints of the spine.  (Id.)  Dr. Koppel

diagnosed Plaintiff with lumbar faced joint arthropathy, post-laminectomy pain syndrome, and

lumbar nerve root disorder.  (Id.)

In an undated assessment of Plaintiff's ability to do work-related activities, Dr. Koppel

found that Plaintiff was occasionally able to lift and or carry ten pounds and stand or walk at least

two hours in an eight hour workday.  (Tr. 375-77.)  Plaintiff cannot sit without periodically

alternating between sitting and standing in order to relieve pain or discomfort.  (Tr. 376.)  His

ability to push or pull is limited in his lower extremities.  (Id.)

    2.    Dr. Michael Rutigliano

Although ALJ John M. Farley only considered an undated letter from Dr. Rutigliano

urging a finding of disability for Plaintiff, the record also contains Dr. Rutigliano's assessment of Plaintiff's ability to do work-related activities, dated April 10, 2006 as well as how much he can carry and how frequently he is able to do so. (Tr. 375-77, 380-82.) According to Dr. Rutigliano, Plaintiff can occasionally lift or carry ten pounds, frequently lift or carry ten pounds, and can stand or walk at least two hours in an eight hour workday. (Tr. 380.) Similar to Dr. Koppel, Dr. Rutigliano also noted that Plaintiff cannot sit without periodically alternating between sitting and standing in order to relieve pain or discomfort, and pushing or pulling is limited to his lower extremities. (Tr. 381.)

3. Dr. R. Briski[25]

Dr. Briski, a consultant, found that Plaintiff could do light and sedentary work. (Tr. 30.) Upon reviewing the record, Dr. Briski determined in his report dated June 24, 2002 that Plaintiff is capable of occasionally lifting or carrying twenty pounds, frequently lifting or carrying ten pounds, and standing or walking for about six hours in an eight hour workday. (Tr. 298.) Plaintiff's pushing or pulling capabilities have not been limited. (Id.) Dr. Briski based his findings on Plaintiff's condition at specific dates after Plaintiff's surgery on May 15, 2001. (Id.) Dr. Briski highlighted that Plaintiff denied experiencing significant pain, and that Plaintiff received unchanged neurological exam results in August 2001.[26] Dr. Briski also based his findings on physical examination in December 2001, where plaintiff complained of pain with

[25] Dr. Briski's first name is not legible in the record. (Tr. 297-304.)

[26] Dr. Briski was referring to Plaintiff's follow-up visit to Dr. Hess' office three months after the surgery, on August 27, 2001. (Tr. 268.) With regard to Plaintiff's neurological exam, Dr. Briski reported that Plaintiff had normal motor strength, sensation, and reflexes remained were not diminished. (Tr. 299.)

prolonged sitting, even though his neurological exam remained unchanged,[27] and a March 2002 follow-up where Plaintiff complained of intermittent low back pain, even though his examination remained unchanged and fusion instrumentation was in good position.[28]  (Tr. 298-99.)

### III.  DISCUSSION

**A.     Standard of Review**

This Court has jurisdiction to review the Commissioner's decision, pursuant to 42 U.S.C. § 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard, 841 F.2d at 59).  The reviewing court must consider the totality of the evidence and then determine whether there is substantial evidence to support the Commissioner's decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom.

---

[27] Dr. Briski was referring to Plaintiff's December 3, 2001 follow-up visit to Dr. Hess approximately six months after the May 13, 2001 surgery.  (Tr. 265.)

[28] Dr. Briski was referring to Plaintiff's March 1, 2002 follow-up visit to Dr. Hess approximately ten months after the surgery. ( Tr. 263.)  Plaintiff reported having "good days and bad days" with the low back pain.  (Id.)

Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

    In the determination of whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; (4) the claimant's educational background, work history and present age." Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981). Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence which may also support a different conclusion. Blalock, 483 F.2d at 775.

**B.   Statutory Standards**

    The claimant bears the initial burden of establishing his or her disability. 42 U.S.C. § 423(d)(5). To qualify for DIB or SSI benefits, a claimant must first establish that he is needy and aged, blind, or "disabled." 42 U.S.C. § 1381. A claimant is deemed "disabled" under the Act if he is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987). Disability is predicated on whether a claimant's impairment is so severe that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §

21

423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp. 2d 302, 316 (D. Del. 2002).  Finally, while subjective complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A).  An impairment only qualifies as a disability if it "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

C.      **The Five Step Evaluation Process and the Burden of Proof**

Determinations of disability are made by the Commissioner, pursuant to the five-step process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.[29]  20 C.F.R. § 404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is not "disabled" and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).  At step two, the Commissioner must determine whether the claimant suffers from a severe impairment.  20 C.F.R. § 404.1520(a)(ii)(c).  An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Id.  In determining whether the claimant has a severe impairment, the age, education, and work experience of the claimant will not be considered.  See id.  If the claimant is found to have a severe impairment, the Commissioner addresses step three of the process.

At step three, the Commissioner compares the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If the claimant's

_____

[29] Substantial gainful activity is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

impairment(s) meets or equals one of the listed impairments, he will be found disabled under the

Social Security Act.  If the claimant does not suffer from a listed impairment or its equivalent,

the analysis proceeds to steps four and five.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the

Third Circuit found that to deny a claim at step three, the ALJ must specify which listings[30] apply

and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501,

505 (3d Cir. 2004), however, the Third Circuit noted that "Burnett does not require the ALJ to

use particular language or adhere to a particular format in conducting his analysis.  Rather, the

function of Burnett is to ensure that there is sufficient development of the record and explanation

of findings to permit meaningful review."  Id.  An ALJ satisfies this standard by "clearly

evaluating the available medical evidence in the record and then setting forth that evaluation in

an opinion, even where the ALJ did not identify or analyze the most relevant listing."  Scatorchia

v. Comm'r of Soc. Sec., 137 F. App'x 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the RFC to perform

his past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to perform his past

relevant work, he will not be found disabled under the Act.  In Burnett, the Third Circuit set forth

the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional
> capacity enables her to perform her past relevant work. This step involves three
> substeps: (1) the ALJ must make specific findings of fact as to the claimant's
> residual functional capacity; (2) the ALJ must make findings of the physical and
> mental demands of the claimant's past relevant work; and (3) the ALJ must
> compare the residual functional capacity to the past relevant work to determine

---

[30] Hereinafter "listing" refers to the list of severe impairments as found in 20 C.F.R. Part
404, Subpart P, Appendix 1.

whether claimant has the level of capability needed to perform the past relevant
work.

Burnett, 220 F.3d at 120.  If the claimant is unable to resume his past work, and his condition is

deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must

demonstrate that there are other jobs existing in significant numbers in the national economy

which the claimant can perform, consistent with his medical impairments, age, education, past

work experience, and RFC.  20 C.F.R. § 404.1560(c)(1).  If the ALJ finds a significant number of

jobs that claimant can perform, claimant will not be found disabled.  Id.

When the claimant has only exertional limitations, the Commissioner may utilize the

Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet the

burden of establishing the existence of jobs in the national economy.  These guidelines dictate a

result of "disabled" or "not disabled" according to combinations of vocational factors, such as

age, education level, work history, and RFC.  These guidelines reflect the administrative notice

taken of the jobs in the national economy that exist for particular combinations of vocational

factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).  When a claimant's

vocational factors, as determined in the preceding steps of the evaluation, coincide with a

combination listed in Appendix 2, the guideline directs a conclusion as to whether an individual

is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458, 462 (1983).  The

claimant may rebut any finding of fact as to a vocational factor.  20 C.F.R. Part 404, Subpart P,

Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner "must analyze the

24

cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999). Moreover, "the combined impact of the impairments will be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523; Parker v. Barnhart, 244 F. Supp. 2d 360, 369 (D. Del. 2003).  However, the burden still remains on Plaintiff to prove that the impairments in combination are severe enough to qualify him for benefits.  See Williams v. Barnhart, 87 F. App'x 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how a combination-effects analysis would have resulted in a qualifying disability); see also Marcus v. Barnhart, No. 02-3714, 2003 WL 22016801, at *2 (E.D. Pa. June 10, 2003) (stating that "the burden was on [Plaintiff] to show that the combined effect of her impairments limited one of the basic work abilities").

While Burnett involved a decision in which the ALJ's explanation of his step three determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit applies its procedural requirements, as well as their interpretation in Jones, to every step of the decision.  See, e.g., Rivera v. Commissioner, 164 F. App'x 260, 262 (3d Cir. 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but need not "adhere to a particular format."  Id.

**D.    The ALJ's Findings**

ALJ Farley applied the five-step sequential evaluation, and determined that Plaintiff was disabled from September 27, 1999 through September 20, 2006.  (Tr. 19.)

1.    Step One

ALJ Farley found that Plaintiff satisfied step one of the evaluation process, since he "had

not engaged in any substantial gainful activity at any time since the alleged onset date."  (Tr. 20.)

    2.    <u>Step Two</u>

With regards to step two, ALJ Farley found that Plaintiff has the following impairments: a history of chronic back pain status post L4-L5 diskectomy, and laminectomy.  (<u>Id.</u>)

    3.    <u>Step Three</u>

ALJ Farley found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix No. 1.  (Tr. 27.)  ALJ Farley noted that the evidence fails to show a "herniated nucleus pulposus, spinal arachnoiditis,[31] spinal stenosis,[32] osteoarthritis,[33] degenerative disc disease,[34] facet arthritis, or vertebrae fracture."  (Tr. 28.)

    4.    <u>Step Four</u>

ALJ Farley found that Plaintiff is unable to perform any past relevant work.  (Tr.30.) According to ALJ Farley, Plaintiff had the RFC to lift and carry ten pounds frequently, and twenty pounds occasionally; sit for six hours in an eight hour workday; and standing and walking for up to four hours in an eight hour workday.  (Tr. 28.)  ALJ Farley stated that "the claimant's

---

[31] Arachnoiditis is the inflamation of the arachnoid membrane covering the brain. <u>Mosby's</u> at 128.

[32] Stenosis is an abnormal condition characterized by the construction or narrowing of an opening or passageway in the body structure.  <u>Mosby's</u> at 1630.

[33] Osteoarthritis is a form of arthritis in which one of many joints undergo degenerative changes, including subchondral bony sclerosis, loss of articular cartilage, and proliferation of bone spurs (osteophytes) and cartilage in the joint.  <u>Mosby's</u> at 1242.

[34] A degenerative disease is any disease in which deterioration of structure or function of tissue occurs.  <u>Mosby's</u> at 486.

past work consisted of employment as an electrician/industrial pipe bender, where he was required to walk and stand for six hours a day and lift and carry between fifty and one hundred pounds." (Tr. 30-31.) Therefore, ALJ Farley found that Plaintiff's RFC was for light and sedentary work, and that Plaintiff was not capable of returning to his past relevant work. (Tr. 38.)

        5.    <u>Step Five</u>

The ALJ found that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 31.)

**E.**    **<u>Analysis</u>**

Plaintiff asserts that ALJ Farley's decision should be remanded for two reasons. First, Plaintiff contends that ALJ Farley failed in his duty to develop fully the record. Second, Plaintiff argues that ALJ Farley's RFC assessment was not supported by substantial evidence because he selectively reviewed the medical evidence. (Pl.'s Br. 6.) This Court does not agree.

        1.    <u>Every Reasonable Effort Was Utilized by ALJ Farley to Develop the Record Fully</u>

Plaintiff claims that ALJ did not utilize "every reasonable effort" to develop the record before closing it and rendering a decision. (Pl.'s Br. 19-20.)

As Plaintiff's brief notes, "the Supreme Court of the United States has ruled that 'Social security proceedings are inquisitorial rather than adversarial,' and that the ALJ has the duty 'to investigate the facts and develop the arguments both for and against granting benefits.' " (Pl.'s Br. 19 (citing <u>Sims v. Apfel</u>, 530 U.S. 103, 110-11 (2000)).) The Supreme Court has therefore established, that the ALJ is responsible for fully developing the record so that a reviewing court

can determine the rationale behind the decision of the ALJ.  To that end, the ALJ is charged with using "every reasonable effort" to develop fully the record.  The Code of Federal Regulations ('CFR') governing the Social Security Administration defines every reasonable effort to mean that the agency "will make an initial request for evidence from [the claimant's] medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, [the agency] will make one follow up request to obtain the medical evidence necessary to make a determination." 20 C.F.R. § 404.1512(d)(1)).  In addition, the CFR outlines the responsibilities of claimants with respect to requests for evidence by the ALJ.  See 20 C.F.R. §404.1512 (c).  Among, those responsibilities the claimant "must" provide "without redaction" medical evidence showing the severity and duration of impairments.  Id.  Pursuant to the regulation, claimants "must" provide this evidence when it is requested.  Id.

By using every reasonable effort, the ALJ ensures that there is substantial evidence on the record to support his decision.  Burnett v. Commissioner, 220 F.3d 112, 118 (citing 42 U.S.C. § 405(g)).  Substantial evidence is defined as "more than a mere scintilla", and it means "such relevant evidence as a reasonable mind might accept as adequate." Id. (citing Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).

At the hearing, ALJ Farley inquired whether Plaintiff had anything to add to the record. (Tr. 402.)  Plaintiff informed ALJ Farley that additional records were being sent to his attorney, and Plaintiff's attorney expressed his intention to submit these additional documents to ALJ Farley within two weeks.  (Id.)  Plaintiff argues that ALF Farley failed to fulfill his duty to develop fully the record on the basis that the evidence, which his attorney indicated he would submit, was not considered by the ALJ and that no letter was sent to Plaintiff's attorney

28

indicating that the evidence had not been received.  (Pl.'s Br. 19-20.)

Plaintiff's argument ignores several key factors that this Court must also consider. Pursuant to 20 C.F.R. §§ 404.1740 (b) and 416.1540 (b), when Plaintiff is represented by counsel as is the case here, the Plaintiff's attorney has an affirmative duty to "act with reasonable promptness to obtain the information and evidence that the claimant wants to submit in support off his or her claim and forward the same to [the ALJ] for consideration as soon as practicable." Considering the record before this Court, Plaintiff's attorney indicated that two weeks was a practicable amount of time within which to forward additional evidence for ALJ Farley's consideration.

Further, the record indicates an issue with whether the additional evidence had actually been submitted to the ALJ.  At counsel's request, the record was left open for two weeks after the April 11, 2006 hearing; until April 27, 2006.  (Tr. 402.)  While the record may have been left open on the hearing transcript for two weeks, the record before this Court indicates that the record was left open for approximately five months and was only closed when the ALJ rendered his September 20, 2006 opinion on the matter.  (Tr. 18.)  As noted in respondent's brief, the record shows that additional evidence, which Plaintiff's counsel indicated had not been received, appears to have been in his possession on or about March 29, 2006.  (Tr. 375-77, 380-82.) Counsel has also failed to state in his October 30, 2006 letter to the Appeals Council how that additional evidence was submitted or how he verified its receipt.  (Tr. 374.)

This Court must look at the regulations governing the conduct of the parties involved in a disability determination in total and cannot selectively choose the regulations that govern the behavior of the ALJ without also invoking those that govern both the actions of the Plaintiff and

the Plaintiff's counsel.  The regulations require that the ALJ solicit from the claimant any

evidence that the ALJ finds useful in making his determination in the spirit of painting a full

picture from which the ALJ can render a proper opinion about a claimant's entitlement to

disability benefits.  See 20 C.F.R. §404.1512 (d)(1).  However, the responsibility for developing

the record is not solely that of the ALJ.  The regulations also indicate that when asked a claimant

"must" provide the relevant evidence.  Moreover, when Plaintiff is represented by counsel a duty

is imposed on that representative to comply with requests for evidence with "reasonable

promptness."  See 20 C.F.R. §§ 404.1740(b), 416.1540(b).  Taken together the duty to develop

the record fully requires that the ALJ inquire and seek any evidence that will assist his or her

determination, and also that Plaintiff and Plaintiff's counsel comply with those requests.

        After making the initial request for "anything" Plaintiff had to add to the record, and after

Plaintiff and his attorney expressed that the attorney would be sending additional medical

documents, ALJ Farley, aware that there was potentially new or corroborative evidence for the

record, allowed the record to remain open for an extensive amount of time fulfilling his duty

under the regulations.  At a maximum of 10 to 20 days after his original request, ALJ Farley

would have only been required to leave the record open until early May, where here the record

indicates the record remained open until September.  To require more from the ALJ places the

onus on the ALJ to not only ask for additional evidence, but to amass and submit that same

evidence for his consideration.  Raising the duty of the ALJ to this level clearly conflicts with

Congress' intention to impose responsibilities on all parties, as evidenced by a set of regulations

that gives guidelines to how the ALJ, claimant, and that claimant's representative are to govern

themselves in connection with a hearing for disability determination.  Lastly, the regulation

clearly states that one follow up request is required indicating that there is a limit to the number

of times an ALJ is expected to request evidence that has not been submitted for his consideration.

Plaintiff argues that the ALJ should have sent a letter indicating that evidence had not

been received.  (Pl's. Br. 20.)  However, in light of the foregoing regulations, Plaintiff's

argument neglects counsel's duty to ensure that the information submitted is received and added

to the record.  Furthermore, the additional evidence, which was considered by the Appeals

Council, is consistent with the findings of the claimants' previous treating physicians.  In his

October 9, 2002 review of Plaintiff's MRI, Dr. Hess observed that the MRI failed to show

herniation that would be consistent with plaintiff's subjective complaints of pain.  (Tr. 260.)  Dr.

Ragukonis' April 8, 2002 evaluation indicated no difficulty with walking heal to toe while noting

decreased flexion and extension.  (Tr. 247.)  The state's consulting physician, Dr. Friedman,

performed an objective evaluation and determined gait without deviation, an ability by the

claimant to walk on his toes, heels and squat as well as the ability to stand on one leg.  (Tr. 276.)

The examination further showed 5/5 bilateral strength in upper and lower extremities.  (Id.) The

Plaintiff's physical therapist at the Kessler Institute, indicated an ability to carry twenty pounds,

lift eighteen pounds, push forty pounds, and carry ten pounds up and down a ladder.  (Tr. 280.)

Dr. Koppel found that while the Plaintiff had greater extension in his right knee rather than his

left knee, no motor sensory deficits were apparent.  (Tr. 367.)  Dr. Michael Rutigliano, a family

practitioner without the same specialization as the other treating physicians and consultants, was

the only doctor to recommend a finding of permanent disability.  (Tr. 359.)

In the additional evidence submitted, Dr. Koppel offered an opinion about the Plaintiff's

indication that in spite of being debilitated he could walk eight to ten miles at a time and bicycle

suggesting that the neutral position of the spine may be a factor in his activity level.  (Tr. 379.)

However, his assessment continued to indicate an ability to lift or carry ten pounds occasionally

or frequently, and to stand and walk at least two hours in an eight hour workday.  (Tr. 375-77.)

Dr. Rutigliano made similar findings.  (Tr. 380.)  Dr. Briski, a consultant, made findings similar

to those of Drs. Rutigliano and Koppel, although he noted an ability to stand for six hours out of

the eight in a workday.  (Tr. 298.)  Given that this evidence is consistent with the ALJ's finding

that the Plaintiff is able to perform light and sedentary work, this Court cannot find that ALJ

Farley did not evaluate substantial evidence constituting more than a mere scintilla in reaching

his conclusions, or that an error resulted from the failure to consider additional evidence when

that evidence would only further corroborate the evidence on record.

> 2.    ALJ Farley's Assessment of Plaintiff's Residual Functional Capacity Is Supported
>        By Substantial Evidence,

Plaintiff charges that ALJ Farley's selective review of the medical records means that his

RFC assessment is not supported by substantial evidence.  (Pl.'s Br. 19.)   For the following

reasons this Court finds that ALJ Farley's RFC assessment does not conflict with the additional

evidence admitted by the Appeals Council, and is supported by substantial evidence.

A Plaintiff's RFC is defined as "that which an individual is still able to do despite the

limitations caused by his or her impairment(s)."  Burnett, 220 F.3d at 121 (citing Hartranft v.

Apfel, 181 F.3d 358, 359 n. 1 (3d Cir. 1999)).  It has been established that substantial evidence

"is more than a mere scintilla of evidence but may be less than a preponderance."  Brown v.

Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  The reviewing court is charged to "consider the

totality of the evidence and then determine whether there is substantial evidence to support the

commissioner's decision.  Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  To be found capable of performing light work, a person must be capable of "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and to be able to do "a good deal of walking or standing, or when a job involves sitting pushing and pulling of arm and leg controls."  Id. (citing 20 C.F.R. § 404.1567(b)).

Plaintiff was injured on September 28, 1999.  (Tr. 183.)  The evidence before ALJ Farley included documents chronicling Plaintiff's medical history from the onset date of Plaintiff's alleged disability through August 23, 2005.  (Tr. 183, 378-79.)

The fact-finder has an obligation to review all the evidence of record to decide whether or not the claimant's testimony is credible.  In determining whether a claimant is entitled to benefits under the Act, the Secretary has an obligation to weigh the medical evidence and make choices between conflicting evidence.  Williams v. Sullivan, 970 F.2d 1178, 1187 (3d Cir. 1999).  "That evidence includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimants limitations by others."  Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2000) (citing 20 C.F.R. §404.1545(a)).  While ALJ Farley did not have the additional medical evidence at the point where the record was closed, the additional evidence before this Court shows that Dr. Rutigliano, the only doctor who does not specialize in neuro-spinal surgery or pain management, recommended a finding of disability.[35]  In contrast, Dr. Hess found no herniation or spinal stenosis, Dr. Friedman found Plaintiff's strength to be 5/5, and Dr. Briski confirmed as much.

---

[35] Interestingly, in an undated assessment, Dr. Rutigliano also found Plaintiff's physical capacity to be consistent with ALJ Farley's RFC assessment.

Taken together, these findings do not contradict, but rather buttress ALJ Farley's RFC determination.

Two requirements function concomitantly within the RFC determination. "Where there is conflicting probative evidence in the record, [the Third Circuit] recognize[s] a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided. Fargnoli, 247 F.3d at 42 (citing Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981)). In addition, the Circuit has found that "where a treating source's opinion on the nature and severity of a claimant's impairment is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record,' it will be given 'controlling weight.'" Id. at 43. Indeed, "when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). This suggests that medical evidence is not only controlling when it has the benefit of objective diagnostic tests, but also that cumulative evidence of the same type will be considered controlling by the ALJ's choice against evidence taking a contrary position to the accumulated evidence in a claimant's case.

Approximately two months after the surgery, on July 16, 2001, despite complaining of a few minor incidents of increased pain, Plaintiff informed Dr. Hess that his pain had improved overall. X-rays taken by Dr. Hess show good position of the instrumentation and that the Plaintiff was doing well. (Tr. 269.) By September 22, 2001 Plaintiff was complaining of increased lower back pain after beginning physical therapy. (Tr. 269, 267.) The record indicates that a few months later in March and April 2002, Plaintiff reported having "good days and bad

days" with pain, and Dr. Hess noted that Plaintiff was having "intermittent" pain.  (Tr.  263,

261).  Although an MRI did not show a surgically correctable lesion, disk herniation or stenosis,

in October 2002 Dr. Hess suggested that Plaintiff undergo additional surgery and recommended

Plaintiff for chronic pain management.  (Tr. 360.)  While Dr. Hess' notes indicate subjective

complaints of pain, the medical examinations he performed in conjunction with those complaints

did not yield a medically determinable post operative cause of that pain. "[A]llegations of pain

and other subjective symptoms must be consistent with objective medical evidence."  Hartranft v.

Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. §404.1529).

    In his RFC assessment, ALJ Farley discredited Plaintiff's complaints of severe pain,

explaining that "Dr. Hess thought that conservative therapy was adequate to treat Plaintiff's

complaints," and further stating that "there is no evidence that he [Plaintiff] was a candidate for

surgical intervention after his initial spinal fusion."  (Tr. 29.)  This premise supports ALJ

Farley's  conclusion on Plaintiff's RFC.  As discussed earlier, the record indicates that by

October 2002, although Dr. Hess recommended additional surgery, x-rays revealed no particular

malady for which surgery would be necessary and that Dr. Hess recommended chronic pain

management in order to deal with Plaintiff's pain.  (Tr. 360.)  In assessing Plaintiff's RFC, ALJ

Farley relied heavily on the therapist's report at the Kessler Institute for Rehabilitation, recording

that Plaintiff was capable of carrying twenty pounds; lifting eighteen pounds, pushing forty

pounds, and carrying 10 pounds up and down a ladder.  (Tr. 29, 281.)  The therapist's

conclusions were re-iterated in the reports of Dr.'s Koppel (Tr. 375-77) and Brinski (Tr. 298).

Dr. Hess' post-operative examination revealed that aside from occasional discomfort, Plaintiff

was doing reasonably well post surgery.  (Tr. 360.)  Dr. Friedman's report made similar

conclusions about Plaintiff's ability to perform standard tests in spite of his pain.  (Tr. 276.)

ALJ Farley relied on a number of reports which objectively corroborated Plaintiff's condition.  Referring to Dr. Briski, ALJ Farley stated that his RFC conclusion is supported by the State Agency medical consultants who also found that the claimant could perform light sedentary work.[36]  (Tr. 30.)  A therapist from the Kessler Institute issued a report stating that, as of January 25, 2002, the therapist was working with Plaintiff on improving his standing or walking time from four hours per day to six to eight hours per day.  Dr. Briski concluded that Plaintiff was capable of walking six to eight hours per day as of June, 24, 2002.  (Tr. 298.)

Based on this evidence, this Court concludes that evidence exists in the record to support ALJ Farley's evaluation of the credibility of Plaintiff's complaints and testimony.

## IV. CONCLUSION

For the reasons stated above, this Court finds that Commissioner's decision is supported by substantial evidence and is affirmed.

 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Date: January 30, 2009

---

[36] ALJ Farley does not particularly mention Dr. Briski as the consultant, but he refers to Exhibit 16F, which is Dr. Briski's assessment of Plaintiff's RFC.  (Tr. 297.)

36